AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| United States of America<br>v.<br>ROBERT CHOATE<br>SARAH ANDERSON<br>FABIAN GOMEZ<br>EPIFANIO RAMIREZ<br>WENDY LABUDA<br>WILLIAM OWEN<br>JOALEEN ROGERS | ) )<br>)<br>)<br>)<br>)<br>)<br>) |

Defendant(s)

**FILED**

Jun 14, 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SEALED

Case No.

2:22-mj-0095 KJN

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Betweeen on or about _____August 10, 2020 and May 10, 2022_____ in the counties of _El Dorado and Sacramento_ in the

_____Eastern_____ District of _____California_____, the defendant(s) violated:

| Defendant | Code Section | Offense Description |
|---|---|---|
| Robert Choate | 21 U.S.C. § 841(a)(1)<br>21 U.S.C. § 841(a)(1) | **Distribution of Methamphetamine (2 Counts)**<br>**Distribution of Heroin** |
| Sarah Anderson | 21 U.S.C. §§ 846, 841(a)(1)<br>21 U.S.C. § 841(a)(1) | **Conspiracy to Distribute Methamphetamine**<br>**Distribution of Methamphetamine (5 Counts)** |
| Fabian Gomez | 21 U.S.C. §§ 846, 841(a)(1)<br>21 U.S.C. § 841(a)(1)<br>21 U.S.C. § 841(a)(1) | **Conspiracy to Distribute Methamphetamine**<br>**Distribution of Methamphetamine (5 Counts)**<br>**Distribution of Heroin** |
| Epifanio Ramirez | 21 U.S.C. §§ 846, 841(a)(1)<br>21 U.S.C. § 841(a)(1) | **Conspiracy to Distribute Methamphetamine**<br>**Distribution of Methamphetamine (5 Counts)** |
| Wendy Labuda | 21 U.S.C. §§ 846, 841(a)(1)<br>21 U.S.C. § 841(a)(1)<br>21 U.S.C. § 841(a)(1) | **Conspiracy to Distribute Methamphetamine**<br>**Distribution of Methamphetamine (5 Counts)**<br>**Distribution of Heroin** |
| William Owen | 21 U.S.C. §§ 846, 841(a)(1)<br>21 U.S.C. § 841(a)(1) | **Conspiracy to Distribute Methamphetamine**<br>**Distribution of Methamphetamine (3 Counts)** |
| Joaleen Rogers | 21 U.S.C. §§ 846, 841(a)(1)<br>21 U.S.C. § 856 | **Conspiracy to Distribute Methamphetamine**<br>**Maintaining a Drug Involved Premises** |

This criminal complaint is based on these facts: (**see attachment**)

☒  Continued on the attached sheet.

/s/

_____
Complainant's signature

Preston Patton, Special Agent, FBI
Printed name and title

Sworn to me and signed via telephone.

Date:   _____06/14/22_____

_____
Judge's signature

City and state:   _____Sacramento, California_____

Kendall J. Newman, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT, ARREST WARRANTS, AND SEARCH WARRANTS

## CONTENTS

I.      AGENT BACKGROUND AND EXPERIENCE ...........................................................1

II.     REQUESTED WARRANTS ......................................................................................1
        A.      Individuals.................................................................................................2
        B.      Locations ...................................................................................................2
        C.      Vehicles.....................................................................................................3

III.    STATEMENT OF PROBABLE CAUSE ....................................................................5
        A.      Investigation Summary .............................................................................5
        B.      Controlled Buys ........................................................................................6
                1.      Robert Choate ................................................................................7
                        a.      September 3, 2020 – 382g Methamphetamine. ...................7
                        b.      September 15, 2020 –22g Heroin; AK-47 Style Rifles ...........8
                        c.      October 1, 2020 (Anderson) – 166g Methamphetamine; 0.97g Heroin ................................................................................9
                2.      Sarah Anderson ...........................................................................10
                        a.      August 10, 2020 – 55g Methamphetamine .........................10
                        b.      August 13, 2020 – 111g Methamphetamine ........................11
                        c.      November 12, 2020 (Gomez; Labuda) – 446g Methamphetamine..............................................................11
                        d.      December 2, 2020 (Gomez; Labuda) – 670g Methamphetamine...............13
                        e.      January 7, 2021 (Gomez) – 231g Methamphetamine ..............14
                3.      Fabian Gomez ..............................................................................15
                        a.      March 24, 2021 – 167g Methamphetamine ...........................15
                        b.      November 4, 2021 – 24.1g Heroin.......................................15
                        c.      November 9, 2021 – 219g methamphetamine ...........................16
                4.      Epifanio Ramirez ........................................................................17

a.      November 29, 2021 – 2.7 g Methamphetamine............................................17

b.      December 1, 2021 (Rogers) – 222g Methamphetamine ...........................18

c.      January 5, 2022 (Rogers) – 456g Marijuana...............................................18

d.      January 13, 2022 (Labuda; Owen) – 782g Methamphetamine................19

e.      May 10, 2022 – 231g Methamphetamine ....................................................22

5.      Wendy Labuda ...............................................................................................23

b.      February 2, 2022 (Owen) – 1.6kgs Methamphetamine ...........................23

c.      March 1, 2022 (Owen) – 1.34kgs Methamphetamine; 90 g
Heroin ..............................................................................................................24

C.      Additional Probable Cause to Search Target Location 3 ....................................27

IV.    AFFIANT'S EXPERIENCE REGARDING ITEMS TO BE SEIZED ........................................30

V.     AUTHORIZATION REQUEST ........................................................................................34

VI.    REQUEST FOR COMPLAINT AND WARRANT .............................................................35

VII.   REQUEST TO SEAL .....................................................................................................35

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT, ARREST WARRANTS, AND SEARCH WARRANTS

I, Preston Patton, Special Agent with the Federal Bureau of Investigation, having been duly sworn, hereby depose and state:

## I.      AGENT BACKGROUND AND EXPERIENCE

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since July 2014.  Since March 2020, I have been assigned to the South Lake Tahoe Resident Agency (RA) of the Sacramento Division of the FBI.

2.      While employed by the FBI, I have investigated federal criminal violations related to transnational organized crime, domestic terrorism, counter-intelligence, violent gangs, and child exploitation.

3.      During my training, I received instruction in Title 21 of the United States Code, including, but not limited to Sections 841(a) and 922.  In the course of my employment, I have participated in a number of investigations involving the use of federal and state warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, firearms, and other types of evidence that document the activities of criminal organization in both the manufacturing and distribution of controlled substances and weapons.

4.      I am a federal law enforcement officer who is engaged in enforcing federal criminal laws, and I am authorized by the Attorney General to request a search warrant.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  It does not set forth all of my knowledge of this matter, but instead contains information sufficient to show there is probable cause for the requested complaint, arrest warrant, and search warrant.

## II.      REQUESTED WARRANTS

6.      This affidavit is submitted in support of a request that Complaints, Arrest Warrants, and Search Warrants be issued for the following individuals, addresses, and vehicles related to violations of 21 U.S.C. §§ 846, 841(a)(1) Conspiracy to Distribute and to Possess with the Intent to Distribute Methamphetamine, and 21 U.S.C. § 841(a)(1) - Distribution of Methamphetamine and Distribution of

Heroin (collectively the "Target Offenses"); as set forth below, there is probable cause to believe that evidence (more particularly described in Attachment B, and incorporated herein) tending to establish these violations at the following places, in the following vehicles and by the following individuals. Search Warrants are being sought for locations in the Eastern District of California, as well as for vehicles that are presently located within the Eastern District of California (collectively, the "**Target Locations**").

    **A.**    <u>**Individuals**</u>

    a)    **Robert Choate,** for violations of 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine and Distribution of Heroin;

    b)    **Sarah Anderson,** for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine;

    c)    **Fabian Gomez,** for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine and Distribution of Heroin;

    d)    **Epifanio Ramirez,** for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine;

    e)    **Joaleen Rogers**, for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. §856, Maintaining a Drug Involved Premises;

    f)    **Wendy Labuda**, for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine and Distribution of Heroin; and

    g)    **William Owen**, for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine.

    **B.**    <u>**Locations**</u>

    a)    **2504 Fountain Ave., South Lake Tahoe, CA** ("**Target Location 1**") – **Joaleen Rogers'** residence.  Vehicles registered to this address list **Rogers** as the registered owner.  Reports from SLTPD, Rio Vista Police Department, and United States Forest Service have recorded multiple contacts with **Rogers** at this address for over ten years.  Over the course of this investigation,

surveillance agents have seen **Rogers** and **Ramirez** enter and leaving the residence at **Target Location 1** many times.  In addition, **Target Location 1** served as the meeting location for five of the controlled buys described below, which either occurred at the residence, or at another location from which the parties went after meeting at **Target Location 1**.[1]  As described further below, reports from the CHS executing the buys indicate that **Rogers** and **Ramirez** reside at, and store narcotics at, **Target Location 1**. (Attachment A-1).

b)      **2100 Ethan Way, Sacramento, CA ("Target Location 2")** – **William Owen's** residence.  Over this course of this investigation, surveillance agents have seen **Owen** entering and leaving this residence on multiple occasions.  Following a controlled buy on January 13, 2022, agents saw **Owen** return to this residence.  On February 2, and March 1, 2022, agents saw **Owen** leave this residence before taking part in the controlled buy on each occasion (described below) and then return to it once the deal was done.  DMV records indicate that vehicles parked at **Target Location 2** are registered to William **Owen** at that address.  A CLEAR search also lists **Target Location 2** as **Owen**'s address.  (Attachment A-2).

c)      **3320 Marysville Blvd., Sacramento, CA ("Target Location 3")** – A business address for JTYED Rentals, a jet ski rental business, with which **William Owen** is associated.  An open-source query showed that at least one of the jet skis available for rent from JTYED is registered to **Owen** at his residence (**Target Location 2**).  As described more fully herein, surveillance agents have observed **Owen** coming and going from this business, accessing the building with his own key.  (Attachment A-3)

C.      <u>Vehicles</u>

a)      **Grey 2003 Toyota 4-Runner (California license plate 5DBV483) ("Target Vehicle 1")** – Registered to **Joaleen Rogers** at 2504 Fountain Ave., South Lake Tahoe, CA.  **Ramirez** was seen driving this vehicle during the controlled buy on January 13, 2022, described below.  Surveillance agents have seen this car parked in front of **Target Location 1** within the last two weeks.  (Attachment A-4)

---

[1] See controlled buy descriptions in Section III.B.4. ("**Epifanio Ramirez**").

b)      **Blue and white 1988 Chevrolet Blazer (California license plate 8VUT652) ("Target Vehicle 2")** – Registered to **Joaleen Rogers** at 2504 Fountain Ave., South Lake Tahoe, CA. **Ramirez** was seen driving this vehicle during the controlled buy on May 10, 2022, described below, when he indicated he was leaving to collect additional methamphetamine to sell. Surveillance agents have seen this car parked in front of **Target Location 1** within the last two weeks.  (Attachment A-5)

c)      **White 2002 Subaru WRX (California license plate 8LGR319) ("Target Vehicle 3")** – Registered to **Joaleen Rogers** at 2504 Fountain Ave., South Lake Tahoe, CA.  **Ramirez** and **Rogers** drove in this vehicle to get to **Rogers'** home (**Target Location 1**) to execute the December 1, 2021 deal, described below.  Surveillance agents witnessed **Ramirez** driving **Target Vehicle 3** on multiple occasions throughout this investigation, including as recently as early June 2022.  (Attachment A-6)

d)      **Purple 2004 Ford Super Duty pickup truck (California license plate 30720T1) ("Target Vehicle 4")** – Registered to **Joaleen Rogers** at 2504 Fountain Ave., South Lake Tahoe, CA.  During this investigation, surveillance agents have seen this vehicle parked on **Rogers'** front lawn for the entire time.  The truck does not appear to have moved in some time and it remains on **Rogers'** property at the time of writing.  (Attachment A-7)

e)      **Green Kia sedan (Nevada license plate VNK070) ("Target Vehicle 5")** – Registered to a third party in Nevada, but investigators believe **Rogers** and **Ramirez** are presently using it.  On June 4, 2022, an EDSO deputy stopped **Ramirez** while driving **Target Vehicle 5** after he departed the Sunray Motel, because of an expired registration sticker on the car. The Sunray Motel was known to be a location where with a high volume of narcotic use, sales, and overdoses. The EDSO deputy found **Ramirez** in possession of two methamphetamine pipes, a scale with baggies, pepper spray, and stolen mail.  **Ramirez** was arrested for possession of unlawful paraphernalia, stolen mail, stolen property, and possessing pepper spray as a felon. While deputies remained on the scene, **Rogers** arrived and claimed to be **Ramirez**'s girlfriend. With **Ramirez'** consent, **Rogers** was allowed to take possession of **Target Vehicle 5**, and drove

off in it.[2]  Agents then saw **Target Vehicle 5**, the next day, parked in front of **Roger's** residence. (Attachment A-8)

     f)     **Red Ford F150 pickup truck (California license plate 7Y84695) ("Target Vehicle 6")** – Registered to Marciel **Gomez** (believed to the father of **Fabian Gomez**) at a Post Office Box address in South Lake Tahoe.  As described herein, during a controlled purchase on December 2, 2022, **Fabian Gomez** drove this vehicle, to transport **Sarah Anderson**, **Wendy Labuda,** and approximately 1.5 pounds of methamphetamine. On or about May 15, 2022, an investigator observed **Gomez** driving **Target Vehicle 6** with a female resembling **Anderson,** in South Lake Tahoe. In June 2022, investigators observed **Target Vehicle 6** parked in front of **Target Location 1** where investigators believe **Gomez** and **Anderson** presently reside with **Ramirez** and **Rogers**. (Attachment A-9)

     g)     **Black Cadillac sedan (California license plate 8XFY975) ("Target Vehicle 7")** – Registered to William **Owen** at 2100 Ethan Way, Sacramento, CA. **Owen** was seen driving this car during multiple controlled buys described herein.  (Attachment A-10)

     h)     **White Corvette (California license plate 8UHY531) ("Target Vehicle 8") –** Registered to **William Owen** at 2100 Ethan Way, Sacramento, CA.  Agents have most recently seen **Owen** driving this Corvette on Thursday, June 9, 2022.  (Attachment A-11)

### III.   STATEMENT OF PROBABLE CAUSE

#### A.   Investigation Summary

     7.     The following describes an investigation involving the FBI, South Lake Tahoe Police Department (SLTPD), El Dorado County Sheriff's Office (EDSO), Douglas County Sheriff's Office (DCSO), Drug Enforcement Administration (DEA), U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and U.S. Postal Inspection Service (USPIS), from the spring of 2020 to the present. The investigation identified a loose narcotics and firearms distribution network that included (bottom to top) **Choate, Gomez, Anderson, Rogers, Ramirez, Labuda, and Owen**.  These subjects sold firearms, methamphetamine, heroin, and other narcotics in and around Sacramento, South Lake Tahoe, and

---

[2] During this incident, both **Rogers** and **Ramirez** gave 2504 Fountain Avenue to EDSO deputies as their residence.

elsewhere in the Eastern District of California.  These individuals were also connected to 11 other subjects who were arrested on federal and local charges on August 10, 2021. Below is a summary of the violations and associations which will be described in this affidavit:

a)    **Robert Choate** sold a total of approximately 420 grams of methamphetamine, 22 grams of heroin, and two firearms to an FBI confidential human source (CHS) during four separate controlled purchases.  **Choate** eventually introduced **Anderson** as his drug supplier.

b)    **Sarah Anderson** sold a total of approximately 1.5 kilograms (3.3 lbs) of methamphetamine over six controlled buys.  Anderson eventually introduced **Wendy Labuda** as her drug supplier.

c)    **Fabian Gomez** participated as a driver and coordinator in three of the controlled drug purchases with **Anderson** and separately sold approximately 340 grams of methamphetamine and 24.1 grams of heroin during three controlled buys.

d)    **Epifanio Ramirez** distributed approximately 1.2 kilograms of methamphetamine during three controlled buys.  He also introduced **Labuda** as his source of supply.  All three of these deals were either completed in or initiated at the house of **Ramirez'** girlfriend, **Joaleen Rogers**.

e)    **Joaleen Rogers** participated as a coordinator alongside **Ramirez** in two controlled buys at her residence, totaling approximately 453 grams of methamphetamine.

f)    **Wendy Labuda** sold a total of approximately 3.6 kilograms (7.9 lbs) of methamphetamine and 91 grams of heroin during four different controlled buys.

g)    **William Owen** was one of **Labuda's** sources of supply for drugs.  During this investigation, **Owen** delivered approximately 2.4 kilograms (5 lbs) of methamphetamine and 91 grams of heroin to **Labuda** over the course of three separate controlled buys.

**B.    Controlled Buys**

8.    For each controlled purchase described in this affidavit, the CHS(s) involved acted at the direction of law enforcement agents/officers to arrange the transaction and to execute it.  Immediately before each controlled buy, the CHS met with handling FBI agents, federal task force officers (TFO), or local law enforcement officers, who searched the CHS for contraband and weapons, each time finding none. They then equipped the CHS with one or more covert audio/video recording/transmitting devices

1  and U.S. currency funds for the purchase.  After briefing the CHS about the transaction, the CHS then

2  went to the transaction location, under FBI surveillance.

3      9.      During each transaction, the CHS's interactions with the subjects was recorded by one or

4  more covert devices and observed by surveillance agents when possible.  On completion of the

5  transaction, the CHS returned to a pre-determined location, again under surveillance, to meet with

6  investigators, who retrieved from the CHS any contraband acquired during the purchase as well as

7  recording/transmitting devices. Agents then searched the CHS again for any unexplained contraband and

8  weapons, each time finding none.  On some occasions, surveillance agents continued to monitor the

9  subjects following the controlled buy.  It should be noted that all of the above listed subjects were

10  captured in one or more identifiable surveillance photographs or videos during the controlled purchases

11  detailed below.

12      10.     Following each controlled buy, the identities of the drugs seized were confirmed either by

13  DEA laboratory analysis or narcotics field tests.  The weights and purities of the drugs included in this

14  affidavit are approximate and based on the best information investigators have at the time of writing.

15          **1.     Robert Choate**

16      11.     In August 2020, a confidential human source ("CHS-1")[3] reported that CHS-1 had met an

17  individual named "Bobby," later identified as **Robert Choate**, who claimed to sell drugs.

18      12.     At the direction of law enforcement, CHS-1 completed four controlled buys with **Choate**.

19  Below are the details of each controlled buy**:**

20          a.      **September 3, 2020 – 382g Methamphetamine.**

21      13.     On August 3, 2020, **Choate** agreed to meet CHS-1 at **Choate's** apartment in South Lake

22  Tahoe to sell CHS-1 methamphetamine. After CHS-1 arrived, **Choate** indicated that he could get

23

24      [3] CHS-1 came forward voluntarily and received financial compensation for CHS-1's efforts in
assisting law enforcement.  Investigators have corroborated information CHS-1 provided during the
25  course of this investigation through law enforcement databases checks, surveillance, and other reporting,
and have found it to be reliable.  CHS-1's criminal history includes the following felony convictions:
26  Burglary of Habitation (2000), Burglary of Habitation (2001), Possession with intent to distribute a
quantity of marijuana > 50 kilograms (2004), Tamper/Fabricate Physical Evidence w/Intent to Impair
27  (2017), Bail Jumping and Fail to Appear Felony (2017).  CHS-1 had no pending cases at any time
throughout this investigation and has received no consideration for any criminal matter in which CHS-1
28  has been involved in the past.

approximately one pound of methamphetamine and made a phone call to coordinate its acquisition. **Choate** indicated that they would need to go to Carson City, Nevada, to retrieve the drugs.  In their respective cars, CHS-1 followed **Choate** from his apartment to a grocery store parking lot in Carson City, where **Choate** picked up an unidentified male, after which he drove to a duplex residence at 320 David Street, Carson City.

14.     **Choate** got out of his car and entered the left side of the duplex.  He returned a short time later to tell CHS-1 that the methamphetamine would cost $4,200.  CHS-1 handed **Choate** $4,200. **Choate** then went back inside and returned with what appeared to be roughly a pound of methamphetamine, sealed in a plastic vacuum pack. **Choate,** the unidentified male, and CHS-1 all departed separately.

15.     Following the buy, CHS-1 met with investigators and turned over the suspected methamphetamine.  The DEA laboratory determined the methamphetamine acquired weighed approximately 382 grams with an approximate purity of 90%.

          b.     **September 15, 2020 –22g Heroin; AK-47 Style Rifles**

16.     On August 15, 2020, **Choate** called CHS-1 to say he had firearms and drugs to sell, if CHS-1 was interested.  CHS-1 then went to **Choate**'s apartment to discuss possible transactions. After CHS-1 arrived at **Choate's** apartment, **Choate** called an unknown party to coordinate the delivery of two firearms from Carson City.  **Choate** also indicated that he could acquire heroin and could sell CHS-1 an ounce for roughly $1,000.  **Choate** asked CHS-1 to return to his apartment in approximately one hour, at which time **Choate** anticipated the guns would have arrived.

17.     CHS-1 returned after an hour, as **Choate** requested.  At approximately 1:32 p.m., FBI surveillance agents saw a Jeep Liberty arrive at **Choate's** apartment.  A white male adult got out of the Jeep, carrying what appeared to be two rifles, and went into **Choate's** apartment, accompanied by an adult female and an elementary school aged child.

18.     Inside the apartment, the male carrying the rifles met with the CHS-1 and agreed to sell the two guns—both semi-automatic AK-47 style rifles—for $7,000.  **Choate** remained in the room during the transaction.  During this conversation, the male said that he could also get fully automatic AR-15 rifles with no serial numbers for sale, but added that he did not like bringing guns into California

because of California's assault rifle laws.

19.     Just before CHS-1 left, **Choate** told CHS-1 that he would call within an hour, once he had the drugs.  **Choate** also confirmed that CHS-1 was happy with the gun deal.

20.     A few hours later, **Choate** contacted CHS-1 to say that he could obtain an ounce of heroin, and the two agreed to meet at **Choate**'s apartment.  At approximately 4:56 p.m., CHS-1 arrived at **Choate's** apartment.  Once inside, CHS-1 and **Choate** discussed the sale of heroin and the previous sale of the two firearms.  Eventually, **Choate** indicated that he needed to step outside to collect the heroin from the person delivering it.

21.     At that time, surveillance agents saw **Choate** come out of the apartment and get into a black Nissan SUV.  The SUV circled the block and returned to **Choate's** apartment, where **Choate** got out of the SUV, with a small object in his hands, and went back into his apartment.

22.     Once he was back inside his apartment, **Choate** handed CHS-1 what appeared to be an ounce of heroin.  CHS-1 handed **Choate** $1,253 in exchange.

23.     The DEA laboratory examined the suspected heroin, finding it to weight 22 grams with a purity of approximately 45%.

          c.     **October 1, 2020 (Anderson) – 166g Methamphetamine; 0.97g Heroin**

24.     Several weeks later, on October 1, 2020, CHS-1 and **Choate** again agreed to meet at **Choate's** apartment for CHS-1 to buy more guns from **Choate**.  **Choate** told CHS-1 that he had coordinated for someone to deliver the firearm to South Lake Tahoe from Carson City.

25.     At approximately 2:45 p.m., CHS-1 arrived at **Choate**'s apartment and the two of them spoke for a while. During the conversation, **Choate** indicated that his associate was going to be bringing up two firearms, a quarter pound of methamphetamine, and two ounces of heroin.  **Choate** added that that he had approximately two ounces of methamphetamine to sell, as well as a "test" amount of heroin, if CHS-1 was interested.  **Choate** indicated to CHS-1 that his associate, "who was around the corner" would be arriving soon with more methamphetamine.

26.     At approximately 5:35 p.m., surveillance agents saw a white female adult (later identified as **Sarah Anderson** entering **Choate's** apartment.  (CHS-1's covert audio/video recorder captured **Anderson** introducing herself.) After a short conversation, **Anderson** handed over approximately four

ounces of methamphetamine. CHS-1 gave **Choate** $3,147, in exchange for the two ounces **Choate** had sold him, and the four ounces **Anderson** had supplied. **Choate** also gave CHS-1 the "test" amount of heroin he had mentioned.

27.    The DEA laboratory later determined that the substances **Choate** and **Anderson** sold to CHS-1 were methamphetamine, with a net weight of approximately 166 grams. **Choate** provided approximately 55 grams of methamphetamine with a purity of 90%, along with 0.976 grams of heroin. **Anderson** provided approximately 111 grams of methamphetamine with a purity of 89%.

28.    On February 6, 2021, an SLTPD SWAT team arrested **Choate** on a California fugitive warrant.  At the time, **Choate** was wanted in Nevada for failure to appear on a felony possession of narcotics charge.

## 2.    **Sarah Anderson**

29.    Before **Choate** introduced **Anderson** to CHS-1 in October 2020, another confidential human source ("CHS-2")[4] reported that **Anderson** and her boyfriend **Fabian Gomez**, were selling methamphetamine in and around South Lake Tahoe.  Investigators tasked CHS-2 and, later, CHS-1, with arranging and executing controlled drug buys from **Anderson** and **Gomez**.

30.    At the direction of the FBI, CHS-1 and CHS-2 completed the following seven controlled buys with **Anderson**.[5]

### a.    **August 10, 2020 – 55g Methamphetamine**

31.    On August 7, 2020, CHS-2 reported that **Anderson** had purchased a pound of methamphetamine from "**Wendy**" (later identified as **Wendy Labuda**) in Sacramento.  Over the next two days, CHS-2 coordinated with **Anderson** a time and place to meet to buy two ounces of

---

[4] CHS-2 cooperated as part of an agreement with a local district attorney's office, which took CHS-2's cooperation into consideration when it prosecuted CHS-2's pending state case.  CHS-2 also received financial compensation for CHS-2's efforts in assisting law enforcement.  Investigators corroborated information CHS-2 provided during the course of this investigation through law enforcement databases checks, surveillance, and other reporting, and have found it to be reliable.  CHS-2's criminal history includes the following felony convictions: False imprisonment (1992); Possession of marijuana for sale (1994); Possession of marijuana for sale (1994) Felon in possession of a firearm (1996); and Inflict Corporal Injury Spouse/Cohabitant (2004).

[5] At the time, CHS-2 reported that **Anderson** was driving a rental car, which agents later determined to have been rented by **Gomez**.  CHS-2 also reported that **Anderson** and **Gomez** lived at 1041 Wildwood Ave., Unit #6, South Lake Tahoe.  At the time of writing, however, surveillance agents have determined that **Gomez** and **Anderson** now live at **Rogers**' home (**Target Location 1**).

1  methamphetamine for $1,200.

2      32.    On August 10, 2020, CHS-2 met **Anderson** at the agreed location, a parking lot at 3715

3  Lake Tahoe Blvd., South Lake Tahoe.  **Anderson** had arrived by herself.  When they met, **Anderson**

4  handed CHS-2 what appeared to be two ounces of methamphetamine.  As agreed, CHS-1 handed her

5  $1,200 in exchange.

6      33.    The DEA laboratory later confirmed that the substance **Anderson** sold CHS-2 was

7  methamphetamine, weighing approximately 55 grams, with a purity of 90%.

8             b.    **August 13, 2020 – 111g Methamphetamine**

9      34.    On August 12, 2020, **Anderson** contacted CHS-2 to say that she had another four ounces

10  of methamphetamine for sale, for $2,400.  CHS-2 indicated that he/she was interested in buying it, and

11  they agreed to meet at the same location as the August 10, 2020 buy.  (Prices at the time were high

12  because the pandemic had created a shortage of methamphetamine in South Lake Tahoe.)

13      35.    On August 13, 2020, CHS-2 met **Anderson** in the parking lot at 3715 Lake Tahoe Blvd.

14  **Anderson** arrived in the same rental car as previously noted, accompanied by an unidentified female.

15  **Anderson** met with CHS-2 and handed over what appeared to be approximately four ounces of

16  methamphetamine.  CHS-2 gave **Anderson** $2,400 in exchange.

17      36.    The DEA laboratory later confirmed the substance CHS-2 purchased to be

18  methamphetamine, weighing approximately 111 grams with a purity of approximately 90%.

19             c.    **November 12, 2020 (Gomez; Labuda) – 446g Methamphetamine**

20      37.    On October 01, 2020, CHS-1 was introduced to **Anderson** by **Choate** during the

21  controlled purchase of six ounces of methamphetamine, on October 21, 2020.  *See* ¶¶ 24-27, above.

22      38.    On November 10, 2020, **Anderson** and **Fabian Gomez** contacted CHS-1 to say they

23  could sell CHS-1 a pound of methamphetamine. They indicated that they would go to Sacramento to

24  collect the methamphetamine around 11 a.m. and return to South Lake Tahoe by 4 p.m.

25      39.    When **Anderson** and **Gomez** had failed to return by 4 p.m., they cancelled the deal and

26  said they would be ready to sell the pound of methamphetamine on November 12, 2020.

27      40.    On November 12, 2020, **Anderson** contacted CHS-1 to say that her methamphetamine

28  supplier was on "her" way with a pound of methamphetamine.

41.     Immediately before this buy, **Anderson** indicated that her source of supply was running late and started a three-way conference telephone call with "Wendy" (later confirmed to be **Wendy Labuda**).[6] During this call, **Anderson** and **Labuda** discussed the upcoming methamphetamine sale, and **Labuda** mentioned that she would be coming from Cameron Park.

42.      While getting ready for the buy, CHS-1 had conversations with both **Anderson** and **Gomez,** via telephone, regarding the availability of the methamphetamine. During one conversation, CHS-1 asked to confirm the methamphetamine's price with **Gomez** (who was speaking to CHS-1 using **Anderson's** telephone number), **Gomez** stated that he would call CHS-1 back.  The CHS then received text messages from **Anderson's** phone number regarding the price of the narcotics.

43.     During the process of arranging the deal, CHS-1 asked **Gomez** about the price and **Gomez** replied that he would have to get back to CHS-1 about it. After some haggling, **Anderson** agreed to sell the pound of methamphetamine for $5,400. CHS-1 then agreed to meet them near 1035 Emerald Bay Road, South Lake Tahoe.

44.     At the agreed upon time that night, **Gomez** and **Anderson** arrived at the meet location which they had agreed with CHS-1, with **Gomez** driving his white GMC Yukon. **Anderson** and **Gomez** led CHS-1 across the street, to where the three of them met **Labuda** (**Labuda** had arrived in a Mercedes SUV, registered in her name). **Labuda** and **Anderson** got into CHS-1's car, where **Anderson** introduced **Labuda** as her methamphetamine source.  **Gomez** and a male adult from **Labuda's** vehicle remained outside the vehicles, looking around, in what appeared to be counter-surveillance.

45.     In the car, **Labuda** indicated that she had two pounds of methamphetamine to sell.  CHS-1 replied that he/she only wanted one pound at that time and handed over the $5,400 in buy funds. **Labuda** handed CHS-1 what appeared to be one pound of methamphetamine.

46.     Following the transaction, CHS-1 identified **Labuda** to investigators as the female who had brought the two pounds of methamphetamine to the deal.  CHS-1 also identified **Gomez** as the driver of the white GMC Yukon, in which **Anderson** had arrived as the passenger.

47.     The following day, **Gomez** texted CHS-1 to see if CHS-1 was happy with the

---

[6] This call was consensually recorded by the CHS-1.

methamphetamine purchased the previous day.  CHS-1 replied that he/she was happy and would likely buy more in the future.  **Gomez** replied, "Im glad G thank you."

48.    A DEA laboratory later determined that the narcotics from this controlled purchase was methamphetamine with a net weight of approximately 446 grams and an approximate purity of 90%.

> d.    **December 2, 2020 (Gomez; Labuda) – 670g Methamphetamine**

49.    On November 17, 2020, CHS-1 made a consensually recorded telephone call to **Anderson** and **Gomez**. **Anderson** answered the telephone and when CHS-1 asked if "homeboy" was available, **Anderson** gave the telephone to **Gomez**.  CHS-1 asked **Gomez** to look into a "scoop of vanilla" and a "scoop of chocolate," for CHS-1 to buy.  **Gomez** later indicated that he could get "toys" which came in "packs," big, small, medium. CHS-1 asked to buy "a baby one" (to indicate a small firearm).  **Gomez** indicated that he was waiting for "them" to tell him the price and would let CHS-1 know the price when he got it.[7]

50.    Communications with **Gomez** and **Anderson** continued through the end of November 2020.  **Gomez** and **Anderson** communicated via text messages with CHS-1 about selling approximately two pounds of methamphetamine and a gun.  They wrote that they could sell the two pounds of methamphetamine on Tuesday night, or they could delay it until Wednesday night, to sell the methamphetamine and the gun at the same time.  Eventually they agreed to meet CHS-1 on Wednesday night (December 2), near 4000 Lake Tahoe Blvd., to sell 1.5 pounds of methamphetamine for $7,500.

51.    At approximately 7:57 p.m., **Anderson** arrived at the agreed upon location as a passenger in a red Ford F150 pickup truck.  **Anderson** got out of the truck and entered CHS-1's vehicle.  Once in the car, **Anderson** said that **Gomez** was driving the red F150 and their supplier had come with them.  **Anderson** said she might be able to get the CHS an additional 0.5 pounds, or at least some of it, but **Anderson** needed to discuss that with **Gomez**. **Anderson** indicated that her supplier had trouble getting enough money together to pick up "that much weight" and that it was hard for them to get the gun and

---

[7] From the context of this investigation, and from my own training and experience, I understand the terms used in this conversation to be coded language for drug sales.  "Vanilla" refers to methamphetamine, because it is almost white in color, and "chocolate" commonly refers to heroin, as heroin is often brown, but in this specific situation, it appears **Gomez** used the term to refer to guns, before settling on the term "toys," to refer to guns.  **Gomez**' reference to "pack" sizes was a reference to the size of the firearms.

drugs together in one place as well.  **Anderson** stated that her methamphetamine supplier had a rifle, but had not brought it with her.  During the conversation, CHS-1 handed **Anderson** $7,400 in buy funds and **Anderson** gave the CHS-1 what appeared to be the requested methamphetamine.

52.     After completing the deal, **Anderson** asked if CHS-1 wanted to say goodbye to **Gomez** who was in the truck.  When **Gomez** rolled down the truck's window, CHS-1 saw both **Gomez** and **Labuda** in the truck.

53.     The DEA laboratory later determined that the drugs sold during this controlled buy were methamphetamine, weighing approximately 670 grams, with a purity of 92%.

                e.     **January 7, 2021 (Gomez) – 231g Methamphetamine**

54.     Communications with **Anderson** and **Gomez** continued through December 2020 and into early January 2021.

55.     On December 3, 2020, CHS-1 made a consensually recorded call to **Anderson**'s telephone number.  **Anderson** answered and then handed the telephone to **Gomez**.  **Gomez** and CHS-1 then had a short discussion about CHS-1 buying more methamphetamine the following week.  **Gomez** and **Anderson** asked if they could do the deal on a Monday, or another day, prior to 4:00 p.m. so that **Gomez** did not have to take time off work. **Gomez** and CHS-1 agreed to speak again at a later time regarding the next drug transaction.

56.     In the days that followed, CHS-1 coordinated with **Gomez** and **Anderson** to buy more methamphetamine and possibly a gun.  They eventually agreed to meet on January 7, 2021, for CHS-1 to buy half a pound of methamphetamine for $3,400.

57.     On January 07, 2021, **Anderson** arrived at the agreed location in a silver sedan. While speaking with CHS-1 she indicated that she had a new source of supply who was sitting in the sedan. When she arrived she only had half a pound of methamphetamine. (**Gomez** had previously indicated that they could sell a pound of methamphetamine and a gun, but **Anderson** explained that they had not been able to get the full pound or the gun.)  **Anderson** explained that **Gomez** had been unable to come to this controlled purchase because he had to work at a casino.  CHS-1 handed **Anderson** the $3,400 in buy funds and **Anderson** handed CHS-1 what appeared to be half a pound of methamphetamine.

/ / /

58.    A DEA laboratory later determined that the substance **Anderson** sold CHS-1 in this transaction was methamphetamine, weighing approximately 231 grams, with a purity of 94%.

### 3.    **Fabian Gomez**

#### a.    **March 24, 2021 – 167g Methamphetamine**

59.    On March 23, 2021, **Gomez** sent CHS-1 a picture of a revolver to ask if CHS-1 was interested in buying it.  **Gomez** also indicated that he had a few ounces of methamphetamine to sell.

60.    The next day, CHS-1 spoke to **Anderson** via telephone, who reported that the revolver was no longer available, but that **Gomez** was ready to sell the methamphetamine. **Gomez** and the CHS eventually spoke on the phone, and **Gomez** indicated that he could meet the CHS to sell methamphetamine **Gomez** at what was later determined to be approximately $500 per ounce.  **Gomez** agreed to meet CHS-1 near 4000 Lake Tahoe Blvd. at approximately 2:30 p.m., for the transaction.

61.    On March 24, 2021, at the agreed time, **Gomez** arrived at the buy location on a white motorcycle.  He got into CHS-1's vehicle and directed CHS-1 to the Hard Rock Casino, where **Gomez** worked. **Gomez** indicated he had arranged to meet his source of supply there, to try to get more methamphetamine.

62.    When they arrived at the Hard Rock Casino, **Gomez** got out of the CHS's vehicle and met with the occupants of a maroon Toyota Tacoma.  After a short conversation, **Gomez** returned to CHS-1 and reported that the people in the other vehicle could not sell any additional methamphetamine. **Gomez** then handed CHS-1 what appeared to be roughly six ounces of methamphetamine, and CHS-1 gave **Gomez** $3,200 in exchange.  **Gomez** then departed and returned to his residence.

63.    The DEA laboratory later determined that the substance **Gomez** sold CHS-1 in this transaction was methamphetamine, weighing approximately 167 grams, with a purity of 92%.

#### b.    **November 4, 2021 – 24.1g Heroin.**

64.    On or about November 02, 2021, another confidential human source ("CHS-3") contacted **Gomez** by telephone to ask about buying methamphetamine.  **Gomez** replied that he was going to be traveling to Las Vegas but that he had a female associate who could sell narcotics on his behalf.

///

65.     On November 03 and 04, 2021, in further conversations with CHS-3, **Gomez** indicated that he could get CHS-3 a pound of methamphetamine for $5,200.[8]  **Gomez** indicated that he would be ready on November 05 to do the deal.  When CHS-3 indicated that CHS-3 wanted to do the deal that day, **Gomez** replied via text message that he would not have the methamphetamine in time, but he could get an ounce of heroin for $1,700.  **Gomez** agreed to meet near 4000 Lake Tahoe Blvd., South Lake Tahoe, to sell the heroin.

66.     On November 4, 2021, CHS-3 contacted **Gomez** to discuss the heroin buy.[9]  **Gomez** agreed to sell CHS-3 a "whole piece of dark" (which CHS-3 understood to mean an ounce of heroin) for $2,000.  **Gomez** told CHS-3 that prices around South Lake Tahoe were high and warned that the heroin was raw "so people that shoot it up need to be careful."  **Gomez** explained to CHS-3 that "one piece is one ounce of black[,] half piece is half ounce of black [,] the lowest I can go is 900 for a half or 1700 for whole."  When CHS-3 asked if **Gomez** could get more heroin or lower the price, **Gomez** explained that "one piece" was all his source of supply had at that time and that he could not go lower on the price because he was getting the ounce for $1,500 himself and he would only be making $200 on the deal. **Gomez** added that, if he went to Sacramento, he could probably get heroin at a lower price.

67.     At approximately 3:53 p.m., agents saw **Gomez** departing his apartment complex with an adult female. **Gomez** eventually arrived at the buy location and entered CHS-3's car. While with CHS-3, **Gomez** exchanged approximately one ounce of heroin for $1,700.

68.     The DEA laboratory later determined that the substance **Gomez** sold CHS-3 in this transaction was heroin, weighing approximately 24.1 grams, with a purity of 39%.

c.     **November 9, 2021 – 219g methamphetamine**

69.     On November 9, 2021, **Gomez** indicated that he could sell a pound for $5,200 and

---

[8] **Gomez** indicated that he had to charge high prices because his source of supply did not want to drive up to Tahoe.  Later **Gomez** indicated that his source of supply was coming from the "border," and he would be meeting them in Sacramento that night.

[9] CHS-3 came to law enforcement voluntarily and received financial compensation for CHS-3's efforts in assisting law enforcement. Although CHS-3 did not initially request immigration benefits in return for CHS-3 assistance, investigators coordinated with the Department of Homeland Security, Immigration and Customs Enforcement (ICE) to assist CHS-3 in attaining legal citizenship. Investigators corroborated information CHS-3 provided during the course of this investigation through law enforcement databases checks, surveillance, and other reporting, and have found it to be reliable. According to law enforcement databases, CHS-3 has no misdemeanor or felony convictions.

possibly a "toy" (firearm). He agreed to meet CHS-3 at 4000 Lake Tahoe Blvd. at approximately 3 p.m.

70.     Later that day, after further price negotiations, **Gomez** agreed to sell the pound of methamphetamine to CHS-3 for $4,800. At approximately 4:09 p.m., **Gomez** was observed departing his residence. Shortly after, **Gomez** arrived at the buy location and entered CHS-3's vehicle. **Gomez** indicated that he had been unable to get a gun to sell, but that he had the drugs CHS-3 had requested. **Gomez** sold the methamphetamine to CHS-3 for the previously agreed price of $4,800.

71.     The DEA laboratory later determined that the substance **Gomez** sold CHS-3 during this deal was methamphetamine, weighing approximately 219 g with a purity of 85%.

### 4.     Epifanio Ramirez

72.     In June 2021, CHS-2 reported that an individual known as "**Junior**" had become a significant drug distributor in South Lake Tahoe. Investigators were able to identify **Junior** as **Epifanio Ramirez**, who was residing at the home of **Joaleen Rogers** at the time (**Target Location 1**). Based on the initial reporting, investigators asked CHS-1 to coordinate controlled drug buys with **Ramirez**. Investigators were able to complete four controlled purchases with **Ramirez** which are detailed below:

### a.     November 29, 2021 – 2.7 g Methamphetamine

73.     On 29 November 2021, at approximately 12:12 p.m., CHS-1 met with **Ramirez** at **Roger's** residence. During the conversation, **Ramirez** said that he traveled to Modesto to buy methamphetamine for between $1,350 - $1,500 dollars per pound, which he would sell for between $1,800-$2,100, depending on what price he paid in Modesto. **Ramirez** agreed to sell the CHS four pounds of methamphetamine for $8,000 dollars at a later date. **Ramirez** said he would have to go to Modesto to pick up the drugs and have them ready for CHS-1 on or about December 1, 2021, at **Roger's** residence. **Ramirez** added that he wanted to introduce CHS-1 to his source of supply in Modesto in the future.

74.     During this interaction, **Ramirez** gave CHS-1 a "test" amount of methamphetamine. When the conversation concluded, CHS-1 left the residence and met with agents.

75.     A DEA laboratory later determined that the substance **Ramirez** provided was methamphetamine, weighing approximately 2.7 grams with a purity of 96%.

/ / /

b.    **December 1, 2021 (Rogers) – 222g Methamphetamine**

76.    On December 01, 2021, CHS-1 arrived at **Rogers**' residence, as agreed with **Ramirez**, at approximately 4:31 p.m., and waited in front. At approximately 5:47 p.m., **Ramirez, Rogers,** and an adult female arrived at **Rogers**' residence in **Rogers'** white Subaru WRX (**Target Vehicle 4**).

77.    On arrival, the adult female went inside the house, separating from **Ramirez** and **Rogers**, and did not take part in the deal.  **Rogers** remained with **Ramirez** in the living room.  **Ramirez** asked **Rogers** to call his sister, which she did. **Rogers** then introduced herself to CHS-1 as "**Joaleen.**" **Ramirez** indicated that his sister would be bringing him the methamphetamine.  **Rogers** and **Ramirez** offered CHS-1 a drink and invited CHS-1 to sit down

78.    After further conversation, Ramirez indicated that he and **Rogers** did not know where his sister was.  **Rogers** said she had been unable to get in touch with her.  Both of them indicated they had been trying to set up the deal.

79.    **Ramirez** then indicated that he was going to drive "back down there" right now, that he would bring the pounds, and that they could "do this" tomorrow, meaning complete the transaction the next day.  **Ramirez** gave the CHSs a sample of marijuana for wasting CHS-1's time.  **Ramirez** also said that he had brought half a pound of methamphetamine with him and offered it to CHS-1. He added that he would go the next day to get more methamphetamine.

80.    **Ramirez** stepped out of the room momentarily. When he returned to the living room, he handed CHS-1 the half pound of methamphetamine, in wrapped plastic packaging.  **Ramirez** indicated that "that was the way it will come", meaning it would be packaged the same way in the future.

81.    **Ramirez** stated that the half pound was "on the house" but that if he got "them" (meaning the pounds of methamphetamine CHS-1 originally requested), he expected CHS-1 to buy them.  At the end of their conversation, CHS-1 departed with the half pound of methamphetamine given to him by **Ramirez** and **Rogers**.

82.    The DEA laboratory later determined that the substance **Ramirez** and **Rogers** gave CHS-1 was methamphetamine, weighing approximately 222 grams, with a purity of 96%.

c.    **January 5, 2022 (Rogers) – 456g Marijuana**

83.    On January 5, 2022, CHS-1 attempted a third controlled buy with **Ramirez** and **Rogers.**

In the days prior to January 5, CHS-1 arranged to meet **Ramirez** at **Rogers'** residence on January 5, to buy more methamphetamine.

84.     At approximately 1:59 p.m., CHS-1 arrived at **Rogers'** residence.  When no one answered the door, CHS-1 called **Ramirez** on his cell phone and **Ramirez** indicated that he was on his way from Modesto.  **Ramirez** added that he would be picking up the methamphetamine in Placerville and would drive to South Lake Tahoe directly from there.

85.     **Ramirez** added that he had not been able to get the four pounds they had agreed but would try and get half a pound of methamphetamine from a supplier in Placerville. **Ramirez** indicated the half-pound of methamphetamine would cost $500.

86.     At 3:16 p.m., **Rogers** met CHS-1 in front of her house.  **Rogers** confirmed **Ramirez** had picked up the methamphetamine for CHS-1 and was on his way from Placerville.

87.     CHS-1 and **Rogers** went into **Rogers'** residence to wait for **Ramirez**.  **Rogers** called **Ramirez** (using her iPad) and **Ramirez** said he was on his way from Placerville.  Eventually, however, it became clear that **Ramirez** was not coming, so **Rogers** gave CHS-1 a pound of marijuana as a gift after **Ramirez** failed to show up.

88.     Officers weighed the marijuana at the SLTPD evidence room, finding it to weigh approximately 456 grams in its packaging.

>            d.     **January 13, 2022 (Labuda; Owen) – 782g Methamphetamine**

89.     On January 13, 2022, **Ramirez** again agreed to meet CHS-1 to sell CHS-1 additional methamphetamine.

90.     At 11:35 a.m., CHS-1 arrived at **Roger's** residence and met **Ramirez**.  **Ramirez** said that he did not have the methamphetamine he had agreed to sell CHS-1 but said they could get it from his supplier in Placerville (he claimed that "everyone" was afraid to come up to Lake Tahoe for fear of law enforcement).  CHS-1 told **Ramirez** that they had $3,800 available for methamphetamine.  **Ramirez** and the CHS agreed to meet later in the day to go to Placerville.

91.     At 1:36 p.m., the CHSs called **Ramirez** and **Rogers** answered the phone.  She agreed to let **Ramirez** know that the CHSs were en route back to her house to meet him.

/ / /

92.     At 1:48 p.m., CHS-1 met **Rogers** and **Ramirez** outside **Rogers**' house. With **Rogers** present, **Ramirez** told CHS-1 to follow him to Placerville.  **Ramirez** indicated that he had spoken with his methamphetamine source, who had told **Ramirez** that she was willing to sell 1.75 pounds of methamphetamine for $3,800.

93.     At approximately 1:59 p.m., **Ramirez** called his supplier to say he was on his way, then indicated to CHS-1 that it was time to leave.  Outside **Rogers'** residence, **Ramirez** got into a grey Toyota 4-Runner (previously identified as being registered to **Rogers)** and departed, with CHS-1 following **Ramirez** in a separate vehicle.

94.     At 3:40 p.m., CHS-1 and **Ramirez** arrived at **Labuda's** residence, 2295 Knollwood Drive, Cameron Park.

95.     Once the CHSs exited their vehicle they met **Labuda**, who indicated that she remembered CHS-1 from the earlier deal.  She offered to show them some of the methamphetamine she had in her house.  She indicated it had come from the same source as the methamphetamine she was planning to sell to CHS-1, so it would be a chance to see the drugs before buying them.

96.     During the discussion, CHS-1 asked **Labuda** if **Ramirez** had told **Labuda** how much the CHSs had to spend.  **Labuda** replied that **Ramirez** had told her they had "38" (meaning $3,800) and that her "guy" (methamphetamine source) knew that.

97.     She added that, when ready, they would all drive to the buy location, where she would meet her supplier and get the methamphetamine from him.  She would then bring it to CHS-1's vehicle, so CHS-1 could inspect it, and they would "do it from there" (meaning complete the deal).   **Ramirez** confirmed that they would get the amount of methamphetamine they wanted. **Ramirez** said that if they did not like the quality of the methamphetamine, they could bring it back.

98.     At 3:50 p.m., surveillance agents watched as CHS-1, **Ramirez** and **Labuda** got into their vehicles.  Driving her blue Mercedes, **Labuda** then led **Ramirez** and CHS-1 to the Home Depot located at 2000 Howe Ave., Sacramento.

99.     At 4:27 p.m., **Labuda** entered the Home Depot parking lot. While she parked, **Ramirez** led the CHS around the block, possibly in an effort to prevent the CHS from seeing **Labuda's** source of supply.  Security camera footage from the Home Depot showed **Labuda** drive out from behind a

temporary red barn-like shed and reposition her vehicle in a different parking spot. Investigators identified a black Cadillac sedan (Registered Owner: **William Owen**, Address: 2100 Ethan Way, Sacramento, CA) also parked behind the red shed, from which it appeared **Labuda** had collected the methamphetamine.

100.     At 4:31 p.m., **Ramirez** parked adjacent to **Labuda's** vehicle with CHS-1's vehicle directly behind him.  **Ramirez** got out of his vehicle and met with **Labuda**. **Ramirez** and **Labuda** then walked to CHS-1's vehicle and **Ramirez** handed CHS-1 a white bag through the open driver window (this bag was later identified as a plastic grocery bag containing 782 grams of methamphetamine in a separate Ziploc bag).

101.     After giving CHS-1 a moment to confirm the bag contained the methamphetamine that CHS-1 wanted, **Labuda** confirmed that CHS-1 was satisfied with the purchase.  When CHS-1 thanked **Labuda** for the methamphetamine, she replied, "You are welcome. Anytime. I do it all the time."

102.     CHS-1 then handed **Labuda** the $3,860 in cash.  **Labuda** indicated that she and **Ramirez** worked together sometimes, but that **Labuda** agreed to take something for **Ramirez** if he was not included directly in the deal. **Labuda** then provided her telephone number, (530) 651-6415, to CHS-1, and said her name was "**Wendy**." **Ramirez** explained how they had just been through a similar issue were **Labuda** had introduced her source of supply to her people with the agreement that if the guy did deals with her people, he would give her some money. **Ramirez** emphasized that they were talking about "racks, more than 30 racks" (Author's Note: a "rack" is a street term most commonly used to mean $1,000).  At the end of the conversation, **Labuda** indicated that she was going to pay her supplier and departed the group.

103.     At 4:34 p.m., security camera footage showed **Labuda** drive her vehicle out of view of the camera to the north (in the direction of the red shed).  Surveillance agents were able to obtain photographs of **Labuda** parking behind the red shed and speaking with the driver and passenger of the black Cadillac sedan.  Agents later identified the driver as **Owen** based on a comparison between surveillance photographs, security camera footage, and his DMV photo.  During this interaction, agents saw **Labuda** hand a bag to **Owen.**

/ / /

104.    At 4:35 p.m., security camera footage showed **Owen** and a second white male adult walk out from behind the red shed and enter Home Depot.  A few seconds later, **Labuda** was filmed driving out from behind the red shed, repositioning her vehicle in a different parking spot, and entering Home Depot by the same doors as **Owen** and his associate.

105.    After **Labuda** had departed, **Ramirez** remained with the CHSs.  He said that CHS-1 could call **Labuda** anytime but that the methamphetamine would be more expensive.  He added that she was a reliable dealer and the methamphetamine's quality was always guaranteed with her.  At 4:43 p.m., the CHSs and **Ramirez** separated.

106.    At 4:44 p.m., security camera footage showed **Ramirez** moving **Rogers'** 4-Runner to a parking spot adjacent to **Labuda's** vehicle and entering Home Depot by the same door as that previously used by **Labuda** and **Owen**.

107.    At 4:55 p.m., security camera footage showed **Labuda** and **Ramirez** checking out together and returning to their cars. **Labuda** got into the driver seat of her vehicle while **Ramirez** accessed the rear driver side passenger door momentarily of her vehicle.

108.    At 4:57 p.m., security camera footage showed **Labuda** and **Ramirez** departing the parking lot in their separate cars, with **Ramirez** following **Labuda**.

109.    A DEA laboratory later determined that the substance **Ramirez, Labuda,** and **Owen** sold during this transaction was methamphetamine weighing approximately 782 grams, with a purity of 90%.

### e.    **May 10, 2022 – 231g Methamphetamine**

110.    On May 7, 2022, CHS-1 went to **Rogers'** house to discuss buying additional methamphetamine from **Ramirez**.[10]  **Ramirez** greeted CHS-1 at the door and CHS-1 asked about buying three more pounds of methamphetamine.  During the conversation, **Ramirez** pulled what appeared to be approximately three pounds of methamphetamine out of a rice cooker in the kitchen and put it on the table.  **Ramirez** indicated that he could sell the methamphetamine for $1,700-1,800 per pound.  He added that he also had an ounce of heroin for sale for $800 (which he showed the CHS).

111.    **Ramirez** provided CHS-1 with a sample of methamphetamine and agreed to meet CHS-1

---

[10] At times, **Ramirez** was difficult to contact by telephone. In order to arrange additional controlled buys, CHS-1 would therefore occasionally go to **Rogers'** house to speak with **Ramirez**.

Case 2:22-mj-00095-KJN   Document 1   Filed 06/14/22   Page 26 of 58


later to sell between one and three pounds of methamphetamine and an once of heroin. After departing, CHS-1 met with SLTPD investigators and turned over the methamphetamine sample **Ramirez** had provided.  Investigators determined that it weighed 2.8 g in the packaging and tested presumptively positive for methamphetamine.

112.    In telephone calls and text messages that followed, CHS-1 and **Ramirez** agreed to meet on 10 May 2022, for CHS-1 to buy three pounds of methamphetamine for $5,400 dollars and an ounce of heroin for $800.

113.    On May 10, 2022, CHS-1 arrived at **Rogers**' residence and **Rogers** opened the door. Inside the house, **Rogers**, **Ramirez**, and CHS-1 discussed the methamphetamine and other topics. **Ramirez** indicated he no longer had the three pounds of methamphetamine which he had shown the CHS earlier, but he did have half a pound of methamphetamine to sell for $900.  The CHS agreed to buy the half-pound and handed **Ramirez** $900.  **Ramirez** then left, ostensibly to see a supplier about getting additional methamphetamine for the CHS.  He drove off in **Rogers**' 1988 Chevrolet Blazer (**Target Vehicle 3**) but did not return.  Once it became obvious that **Ramirez** would not return, the CHS departed and met with investigators.

114.    Upon completion of the operation, investigators processed the half-pound of methamphetamine as evidence at the SLTPD offices.  Officers determined it weighed approximately 231.8 grams.  A field test indicated the substance was presumptively positive for methamphetamine.

### 5.    **Wendy Labuda**

115.    Three controlled purchases involving Wendy **Labuda** have been described previously in this affidavit. Two additional controlled purchases are described below.

### b.    **February 2, 2022 (Owen) – 1.6kgs Methamphetamine**

116.    Starting on January 29, 2022, CHS-1 was in touch with **Labuda** directly to discuss buying 3.5 pounds of methamphetamine.  **Labuda** indicated the price would be $8,600.  **Labuda** ask CHS-1 to meet at her residence on February 2, 2022.

117.     On February 2, 2022, at 3:41 p.m., CHS-1 met **Labuda** at her house, as agreed.  **Labuda** explained that they would meet her methamphetamine supplier either at the Home Depot (where they had done the January 13 deal) or at the supplier's shop in Rio Linda.  She indicated she would call her

supplier while they were en route, to finalize the meeting place.[11]  They then departed with **Labuda** leading the way, driving her Mercedes SUV.

118.    At 4:12 p.m., surveillance agents saw **Owen** depart his residence across the street from the Leo Palmiter Jr./Sr. Highschool at 2100 Ethan Way, Sacramento, in his black Cadillac.[12]

119.    At 4:26 p.m., **Labuda** and CHS-1 arrived in the Home Depot parking lot.  **Labuda** explained that she would meet with her source behind the sheds in the Home Depot parking lot (the same sheds as the January 13, 2022 deal).  She added that she expected the methamphetamine be of a higher quality than the last deal.

120.    At 4:30 p.m., surveillance agents saw **Labuda** drive her SUV across the parking lot, toward the garden sheds. Three minutes later, she returned to CHS-1's vehicle, carrying a bag, and got into the front passenger seat of the vehicle.  Once inside, she handed CHS-1 the bag, which appeared to CHS-1 to contain the requested 3.5 pounds of methamphetamine.

121.    CHS-1 then handed **Labuda** $8,600 in cash.  After taking the money, **Labuda** got out of CHS-1's car and drove away in her Mercedes SUV.

122.    Moments later, surveillance agents saw **Labuda**'s SUV and **Owen's** black Cadillac drive away from Home Depot and park near **Owen**'s residence.  It appears that they went into the residence because, a short time later, agents saw **Labuda** leave **Owen's** residence.

123.    Following the controlled buy, CHS-1 returned to meet with investigators, who took the suspected methamphetamine into evidence.  A field test indicated the substance was presumptively positive for the presence of methamphetamine.  It weighed approximately 1.6 kilograms.

c.    **March 1, 2022 (Owen) – 1.34kgs Methamphetamine; 90 g Heroin**

124.    On 01 March 2022, CHS-1 completed a third controlled purchase with **Labuda** for approximately three pounds of methamphetamine and three ounces of heroin. During the controlled buy, **Labuda** met with two different suppliers – one for the methamphetamine and one for the heroin.

---

[11] During two of the controlled buys with **Labuda**, on February 2, and March 1, 2022, she mentioned that the deal would happen either at Home Depot or at her supplier's "shop" in Rio Linda. Further investigation indicated that the "shop" in question was **Target Location 3**, which housed a jet ski rental business with which **Owen** is associated.

[12] A DMV query indicated that the Cadillac was registered in **Owen**'s name.  This was the same vehicle agents had seen him driving during the January 13, 2022 deal involving **Ramirez** and **Labuda**.

**Labuda's** statements and surveillance operations enabled investigators to identify **Owen** as **Labuda's** heroin supplier. Below is a summary of the controlled purchase:

125.    In a telephone conversation on February 25, 2022, **Labuda** told CHS-1 that she had lowered her prices for methamphetamine.  She added that she planned to get a hotel room at the Thunder Valley Casino, where she wanted to complete the next deal.  In a conversation the next day, she said that she could sell the methamphetamine for $2,200 per pound, and the heroin for $750-800 per ounce.

126.    On March 1, 2022, the CHSs were again in contact by telephone with **Labuda**.  **Labuda** told them she was at the Thunder Valley Casino and wanted to complete the sale of three pounds of methamphetamine there. At the direction of the FBI, CHS-1 told **Labuda** they did not want to do the deal at the casino's hotel and asked for a different location.

127.    At 11:33 a.m., **Labuda** texted to CHS-1, "7882 Lichen Dr., Citrus Heights, CA," as the address where she wanted to meet for the deal. She followed it with a text message that read, "You are looking at 22."  From the context, and from my own experience, I understood this to be a price quote, indicating the methamphetamine would cost $2,200 per pound.  (This was confirmed later, during the transaction with **Labuda**, in which she took $6,600 from CHS-1 for the three pounds.)

128.    At 2:35 p.m., surveillance agents saw **Labuda** park her blue Mercedes SUV at a gas pump at a 76 Gas Station, 7800 Lichen Dr., Citrus Heights.  Agents saw her receive a white bag from an unidentified white male.

129.    At 2:42 p.m., CHS-1 arrived at the location agreed with **Labuda**.  Soon thereafter, the CHS saw **Labuda** park across the street near a Dollar Tree store.

130.    After confirming via telephone that she was in her Mercedes SUV, **Labuda** drove across the street to meet CHS-1, got into the front passenger seat of CHS-1's vehicle and handed over the bag (which appeared to contain the three pounds of methamphetamine requested).  As she handed over the methamphetamine, **Labuda** stated something to the effect of, "This is nerve racking.  Here you go. Check it out."  During this discussion, **CHS-1** handed over $6,600 for the three pounds of methamphetamine.

131.    CHS-1 also said they wanted to buy heroin. When **Labuda** asked how much they wanted, CHS-1 replied that they had around $2,300 to spend, to which **Labuda** responded "So, you want two -

three ounces?" CHS-1 replied that they wanted as much as they could get for the money they had. **Labuda** replied that she would call her supplier right away and let him know.  She explained that CHS-1 should follow her to the Home Depot.

132.    **Labuda** got out of CHS-1's car and but called a short time later to explain that she was going to go across the street to pay "my dude" (which CHS-1 understood to mean the person who had supplied her with the methamphetamine she had just sold to the CHSs).

133.    At 2:55 p.m., surveillance agents photographed **Labuda** park her SUV near a Dutch Brother's Coffee. **Labuda** exited her SUV and spoke with an unidentified person before getting back in her SUV and driving off.

134.    **Labuda** arrived back at CHS-1's location and gave CHS-1 directions to the Home Depot on Howe Avenue.  **Labuda** explained that the heroin source (**Owen**) had said he would have the heroin ready in thirty minutes.

135.    At 3:05 p.m., CHS-1 and **Labuda** departed in their separate vehicles (with surveillance agents following), en route to Home Depot (where additional surveillance agents were waiting).

136.    At 3:28 p.m., CHS-1 and **Labuda** arrived at Home Depot and parked close to each other. At 3:30 p.m., **Labuda** called CHS-1 from her car to say that the heroin supplier would arrive in a few moments and that he would have "three for sure" (which CHS-1 understood to mean three ounces of heroin).  CHS-1 then stated that they had "23" ($2,300), so they would have $50 in change (if the price were $750 per ounce), but they said that **Labuda** could keep leftover cash.  During the conversation, **Labuda** vouched for the quality of the heroin.  CHS-1 asked if the heroin would have any fentanyl in it. **Labuda** replied that she did not think it would, but then added that she did not use heroin, so she would ask her supplier about it.  She also added that, from personal experience, she knew the methamphetamine to be high quality.

137.    At 3:41 p.m., FBI surveillance units observed a man resembling **Owen** leaving **Owen's** residence at 2100 Ethan Way (**Target Location 2**) and get into **Owen**'s Cadillac sedan.

138.    At 3:36 p.m., **Labuda** entered CHS 1's vehicle. **Labuda** reported that the second source of supply was "bummed" because he was missing out on a deal with the CHS.  **Labuda** re-affirmed to the CHS that they were getting the "good shit."

139.    At 3:40 p.m., when it appeared that the heroin supplier would be arriving soon, the CHS handed **Labuda** $2,300 for the heroin, as she got out of the CHSs' car.  She indicated she would meet the heroin supplier and return shortly.  Surveillance agents watched as **Labuda** drove her Mercedes SUV through the parking lot to **Owen's** black Cadillac sedan, which had already parked while under surveillance.  **Labuda** got out of her SUV and into **Owen's** Cadillac momentarily.  When she got out of **Owen's** car, she got back into her own SUV and both she and **Owen** departed from their parking spots.  Surveillance agents watched **Owen** return home.

140.    CHS-1 followed **Labuda** to a second meeting location.  After driving a short distance, **Labuda** parked near Cathay Express, 2550 Cottage Way, Sacramento.  After CHS-1 parked, **Labuda** walked up to the CHSs' vehicle and handed CHS-1 a bag, saying, "Three and a half. He wants y'all back".  (From the context of this deal, CHS-1 understood this to mean that the heroin supplier had given them 3.5 ounces of heroin, instead of just the three for which CHS-1 had paid, because the supplier wanted their continued business).  After handing over the bag, **Labuda** got back into her SUV and left.

141.    Agents submitted the drugs purchased in the two transactions on March 1, 2022 to the DEA laboratory, which determined that the methamphetamine **Labuda** sold during this transaction weighed approximately 1.34 kilograms with a purity of 100%.  The laboratory determined that heroin **Labuda** and **Owen** sold during this buy weighed approximately 90 grams with a purity of 63%.

## C.    Additional Probable Cause to Search Target Location 3

During this investigation, agents identified **Target Location 3** as a commercial property that **William Owen** frequented, and which evidence indicates is partly under his ownership or control.

During three of the controlled buys described above—January 13, February 2, and March 1, 2022—agents saw **Owen** driving his black Cadillac sedan (**Target Vehicle 7**) to make the three separate deliveries of drugs.  In May 2022, a Sacramento Sheriff's Office detective reported that a surveillance unit had observed **Owen** arrive at **Target Location 3**, driving **Target Vehicle 7**.  Surveillance deputies saw **Owen** use a key to access the right side of building at **Target Location 3**.

Additionally, as mentioned above, an open-source search of records related to 3320 Marysville Blvd. indicated that a jet ski rental business known as JTYED Rentals is registered to that address.  (See photograph, below.)  Additional open-source queries showed that at least one of the jet skis available for

1  rent from JTYED is registered to **Owen** at **Target Location 2**, confirming that **Owen** has some

2  ownership stake in JTYED Rentals.



Surveillance agents have determined that the building at this address is divided into multiple

units that can house different businesses.  These areas have entry doors labeled as "A" through "D,"

from left to right as one faces the building.[13]  Agents have determined that JTYED Rentals occupies

units "B," "C," and "D," as well as the garage area enclosed by the metal roll-up door at the south end of

the building.  Area "A" appears to have been leased to a social club which has no known affiliation with



**Owen** or JTYED Rentals.  This affidavit requests permission to search only those areas occupied or used by **Owen** or JTYED Rentals, specifically areas "B," "C," and "D," the enclosed garage area, and the parking lot behind the building where **Owen** has stored at least one car and JTYED Rentals stores its jet skis.

During the controlled buy with **Labuda** on March 1, 2022, **Labuda** mentioned to CHS-1 that her meth supplier (which surveillance confirmed to be **Owen**) was selling a Corvette.  CHS-1 asked **Labuda** for a picture of it, and **Labuda** sent a photograph of a

---

[13] The sign above the second door from the left reads "Employees Only." The doors immediately to the left and right are labeled "A" and "C," respectively, however, so agents have determined that the second door from the left leads to area "B."

1  black Corvette, via text message.  She indicated to CHS-1 the photograph had come from her supplier.

2  (See photograph, left.)  The picture of the Corvette also showed a fenced-in parking lot, in which there

3  were jet skis and other vehicle.  The parking lot was behind an industrial style building with a garage

4  roll up door on the left side, a pedestrian door on the right side, and two industrial lights hanging off the

5  rear wall.  Further surveillance at **Target Location 3** indicated that this photograph was taken in the

6  parking lot of **Target Location 3**.



7      A comparison between the photograph

8  forwarded by **Labuda** and a Google earth street

9  view of the rear of **Target Location 3** revealed

10  that the fenced yard in which **Owen** had his black

11  Corvette was **Target Location 3**'s parking lot.

12  Google Earth images also appeared to show jet

13  skis on trailers in the parking lot.  (See

14  photograph, right.) It appears therefore that

15  JTYED Rentals and Owen both use the parking

16  lot behind the building to store vehicles.

17      On June 9, 2022, FBI agents initiated surveillance at **Owen's** residence, **Target Location 2**.

18  Outside the residence, agents saw **Target Vehicle 7**, as well as **Target Vehicle 8**.  At approximately

19  12:40 p.m., **Owen** departed in **Target Vehicle 8** and arrived at **Target Location 3**, less than ten minutes

20  later.  Over the course of the next hour, surveillance agents saw **Owen** entering and exiting through a

21  utility door adjacent to the garage door as well as the office entrance.  **Owen** was observed unloading an

22  unknown object from the trunk of his white Corvette and taking it inside the building, before departing.

23  Once **Owen** had left, surveillance agents went into the main door of the building and determined that the

24  main door led to a small office with a closed "employee only" door to the back.  FBI surveillance agents

25  also looked around the backside of the building and determined that a black Corvette and multiple jet

26  skis were parked in the rear of the building.

27  / / /

28  / / /

## IV.  AFFIANT'S EXPERIENCE REGARDING ITEMS TO BE SEIZED

142.    Based on my training and experience and consultations with other federal, state, and local law enforcement personnel, I believe the following to be true:

a)      Individuals who engage in the distribution of narcotics often have at their residence or areas under their control, including storage units, warehouses, residences, vehicles under their control, and other locations, controlled substances or dangerous drugs, including methamphetamine and heroin in this case; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting and cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags and containers; and surgical gloves.

b)      Individuals who engage in the illegal distribution of firearms often have at their residence or areas under their control, including storage units, warehouses, residences, vehicles under their control, and other locations, firearms and ammunition, as well as tools for modifying, repairing, and maintaining firearms.

c)      Premises and vehicles used by individuals involved in drug dealing and illicit firearm distribution usually contain articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting, or controlling the premises or property.

d)      Persons involved in the distribution of controlled substances often maintain records and ledgers listing their drug and firearm trafficking activities in these same places. These records are kept to track the ordering, purchasing, storage, distribution, and transportation of controlled substances.  After drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and accounts payable, and to record the names and telephone numbers of suppliers, customers and co-conspirators.  These records are often maintained not only on paper, but also as electronic or digital data in the form of computer hardware and software.

e)      Individuals involved in drug trafficking and the illicit sales of firearms often use telephones, cellular telephones, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business.  Individuals involved in drug trafficking must often rely on

others to obtain drugs and to help obtain, market, distribute, and/or protect drugs.  To achieve some of the aforementioned objectives, I am aware that drug distributors will often, among other methods, have a courier transport drugs or drug proceeds or ship controlled substances/drug proceeds through the mail or by common carrier.  Evidence related to the identities of these co-conspirators are often maintained in these locations.

   f)  Individuals involved in drug trafficking and illicit firearms sales often maintain large amounts of U.S. currency to maintain and finance their on-going drug business.  In addition, assets generated by their drug business are typically kept on-hand by drug dealers to avoid detection by authorities and/or reporting requirements.  Individuals involved in drug trafficking often attempt to legitimize the source of these profits.  In order to do this, they attempt to conceal, transfer and conceal the money by, among other ways: (a) placing assets in names of nominees to avoid detection, while still maintaining control of the assets; (b) laundering money through what appears to be a legitimate business or businesses; (c) hiding money in their homes, storage units, safes, or safety deposit boxes; (d) and using money to buy assets that are hard to trace by law enforcement.  Records of these transactions are often found in the aforementioned locations.

   g)  Additionally, based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic trafficking acquire personal and real property with their narcotics proceeds, and maintain evidence of financial transactions related to obtaining, transferring, concealing, or the spending of large sums of money made from drug trafficking activities.  These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records. Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds, precious metals, gold, diamonds, and other jewelry in an attempt to hide large amounts of currency, and that evidence of such will be located at the described locations.

   h)  Individuals involved in narcotics trafficking and illicit firearms sales often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations.

AFFIDAVIT

31

i)       Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, storage units and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions.  These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution.  Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the premises or in the vehicles to be searched, as indicated in Attachment B attached to each of the locations requested.

j)       Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences and off-site storage facilities.  Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accounts to complete financial statements and tax returns for their business and personal returns.

k)       Persons engaged in illegal activities frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control.  These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records.  Records of this kind are also often stored on computer media.

l)       Persons engaged in illegal activities and/or money laundering often maintain such records for long period of time, particularly when they are involved in ongoing criminal conduct over a long period of time.

m)       There are many reasons why criminal offenders maintain evidence for long periods of time.  The evidence may be innocuous at first glance (*e.g.*, financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials,

computer hardware and software), but have significance and relevance when considered in light of other evidence.  The criminal offender may no longer realize he/she still possesses the evidence.

143.    From my training and experience, I know that individuals involved in drug trafficking frequently store their drugs, drug proceeds, weapons, and other contraband in rooms and areas of their residences that appear to belong to, are controlled by, and/or are accessible to other occupants, including for example, bedrooms belonging to children, other family members, or roommates, in an effort to conceal the evidence from law enforcement and to disguise their ownership and control of the contraband in the event that it is seized.  The same is true for those engaged in the illicit sales of firearms.  This warrant therefore seeks permission to search the entire premises of the **Target Locations** for which the warrants are sought, including any location where there is reasonable cause to believe the items listed in Attachment B may be found.  *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."*)*; *United States v. Ross*, 456 U.S. 798, 820–21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found."); *see also United States v. Adjani*, 452 F.3d 1140, 1146 (9th Cir. 2006) ("Although individuals undoubtedly have a high expectation of privacy in the files stored on their personal computers, we have never held that agents may establish probable cause to search only those items owned or possessed by the criminal suspect. The law is to the contrary.") (citing *Zurcher*); *United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir. 1983) ("Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant.") (cited with approval in *Adjani*).

144.    The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such evidence or documents, their drafts or their modifications may have been crated or stored.

# V.   AUTHORIZATION REQUEST

145.   Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41, for the following locations and vehicles, for the seizure of items described in Attachment B:

a)   **2504 Fountain Ave., South Lake Tahoe, CA** ("**Target Location 1**") **(**Attachment A-1).

b)   **2100 Ethan Way, Sacramento, CA** ("**Target Location 2**") (Attachment A-2).

c)   **3320 Marysville Blvd., Sacramento, CA** ("**Target Location 3")** (Attachment A-3)

d)   **Grey 2003 Toyota 4-Runner with (California license plate 5DBV483) ("Target Vehicle 1**") (Attachment A-4)

e)   **Blue and white 1988 Chevrolet Blazer (California license plate 8VUT652) ("Target Vehicle 2**") (Attachment A-5)

f)   **White 2002 Subaru WRX (California license plate 8LGR319) ("Target Vehicle 3**") (Attachment A-6)

g)   **Purple 2004 Ford Super Duty pickup truck (California license plate 30720T1) ("Target Vehicle 4**") (Attachment A-7)

h)   **Green Kia sedan (Nevada license plate VNK070) ("Target Vehicle 5")** (Attachment A-8)

i)   **Red Ford F150 pickup truck (California license plate 7Y84695) ("Target Vehicle 6**") (Attachment A-9)

j)   **Black Cadillac sedan (California license plate 8XFY975) ("Target Vehicle 7**") (Attachment A-10)

k)   **White Corvette (California license plate 8UHY531) ("Target Vehicle 8")** (Attachment A-11).

/ / /
/ / /
/ / /
/ / /
/ / /

## VI.       REQUEST FOR COMPLAINT AND WARRANT

146.     Based on the foregoing, I believe that probable cause exists to the charge the following individuals with the following violations:

a)       **Bobby Choate,** for violations of 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine and Distribution of Heroin;

b)       **Sarah Anderson,** for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine;

c)       **Fabian Gomez,** for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine and Distribution of Heroin;

d)       **Epifanio Ramirez,** for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine;

e)       **Joaleen Rogers**, for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. §856, Maintaining a Drug Involved Premises;

f)       **Wendy Labuda**, for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine and Distribution of Heroin; and

g)       **William Owen**, for violations of 21 U.S.C. §§ 846, 841(a)(1), Conspiracy to Distribute Methamphetamine, and 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine.

## VII.       REQUEST TO SEAL

147.     I further request that the Court seal the complaint, arrest warrant, and the affidavit and application in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.  These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to the target of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may

seriously jeopardize the investigation. Sealing these documents will also better ensure the safety of agents and others.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Respectfully submitted,

/s/

Preston Patton,
Special Agent,
FBI

Subscribed and sworn to me via telephone:          06/14/22

Hon. Kendall J. Newman
U.S. MAGISTRATE JUDGE

Approved as to form by AUSA James R. Conolly

## ATTACHMENT A-1

### Property to Be Searched

### 2504 Fountain Avenue, South Lake Tahoe, CA ("Target Location 1")

**Target Location 1** is two-story single-family residence on the south side of Fountain Avenue, with grey siding and white trim.  The numbers "2504" are posted in white lettering on the front of the building facing Fountain Avenue.  See photograph, below.

The places to be searched include all rooms, attics, basements, and all other parts therein, and surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, associated with **Target Location 1**; all vehicles, boats, and trailers stored within the fenced in portion of the premises; and all internal and external compartments and all containers (locked and unlocked) contained within the aforementioned places; and all vehicles over which any owner, occupant, or resident of the aforementioned premises has dominion and control, as determined by the agents at the time of the execution of the search warrant by agent's observation of such person operating or accessing the vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person found at the residence.



ATTACHMENT A-1

## ATTACHMENT A-2

### Property to Be Searched

### 2100 Ethan Way, Sacramento, CA ("Target Location 2")

**Target Location 2** is single-story single-family residence located on the north east corner of Ethan Way and Cottage Way, with light brown stucco walls and black trim.  The numbers "2100" are posted in black lettering on the front of the residence facing Ethan Way.  See photograph, below.

The places to be searched include all rooms, attics, basements, and all other parts therein, and surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, associated with the **Target Location 2**; and all internal and external compartments and all containers (locked and unlocked) contained within the aforementioned places; and all vehicles over which any owner, occupant, or resident of the aforementioned premises has dominion and control, as determined by the agents at the time of the execution of the search warrant by agent's observation of such person operating or accessing the vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person found at the residence.



ATTACHMENT A-2

## ATTACHMENT A-3

### Property to Be Searched

### 3320 Marysville Blvd., Sacramento, CA ("Target Location 3")

**Target Location 3** is single-story commercial building located on the east side of Marysville Blvd., with light brown/grey siding and dark brown trim/roof.  The numbers "3320" are posted in black letters above a large roll-up metal garage door on the front of the building facing Marysville Blvd.  A large sign hangs in the center of the building which reads "Jet Ski Rentals" in black letters.



Surveillance agents have determined that this building is divided into units that can house different businesses.  These units have entry doors on the front of the building, labeled as "A" through "D," from left to right as one faces the building.[1]  At the north end of the building is a glass door marked door "A."  To the right of door "A" is a door marked "Employees Only."  To the right of those doors is a double glass door which reads "Jet Ski Rentals," and has "C" signposted above the door.  To the right of the door to unit "C" is a pedestrian utility door labeled as "D."  Finally, at the far right (south) end of the building is a metal roll-up door (under the number "3320") that leads to a garage area.  This garage area has a second metal roll-up door leading out to the building's parking lot

Agents have determined that JTYED Rentals occupies areas "B," "C," and "D," and the

---

[1] Because the doors immediately to the left and right of the door labeled "Employees Only" are labeled "A" and "C," respectively, however, agents have determined that the second door from the left leads to area "B."

ATTACHMENT A-3

garage area enclosed by the roll-up metal doors, and has access to the parking lot behind the building.  This affidavit requests permission to search areas "B," "C," "D," the garage area, and the parking lot behind the building.

  The places to be searched include all rooms, attics, basements, and all other parts therein, and surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, associated with the **Target Location 3**; and all internal and external compartments and all containers (locked and unlocked) contained within the aforementioned places; and all vehicles (including jet skis, boats, and trailers secured on the premises) over which any owner, occupant, or resident of the aforementioned premises has dominion and control, as determined by the agents at the time of the execution of the search warrant by agent's observation of such person operating or accessing the vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person found at the residence.

ATTACHMENT A-3

## ATTACHMENT A-4

### Property to Be Searched

**Grey 2003 Toyota 4-Runner, with California license plate 5DBV483 ("Target Vehicle 1")** – Registered to **Joaleen Rogers** at 2504 Fountain Ave., South Lake Tahoe, CA.  See photograph, below.

The places to be searched include all internal and external compartments of the Target Vehicle and all containers within the Target Vehicle.



.

ATTACHMENT A-4

## ATTACHMENT A-5

### Property to Be Searched

**Blue and white 1988 Chevrolet Blazer, with California license plate 8VUT652 ("Target Vehicle 2")** – Registered to **Joaleen Rogers** at 2504 Fountain Ave., South Lake Tahoe, CA.

 The places to be searched include all internal and external compartments of the Target Vehicle and all containers within the Target Vehicle.



.

ATTACHMENT A-5

**ATTACHMENT A-6**

**Property to Be Searched**

**White 2002 Subaru Impreza WRX, with California license plate 8LGR319 ("Target Vehicle 3")** – Registered to **Joaleen Rogers** at 2504 Fountain Ave., South Lake Tahoe, CA.  See photograph, below.

The places to be searched include all internal and external compartments of the Target Vehicle and all containers within the Target Vehicle.



Page 1 of 1

ATTACHMENT A-6

### ATTACHMENT A-7

### Property to Be Searched

**Purple 2004 Ford Super Duty pickup truck, with California license plate 30720T1** (**"Target Vehicle 4"**) - Registered to **Joaleen Rogers** at 2504 Fountain Ave., South Lake Tahoe, CA.  See photograph, below.

The places to be searched include all internal and external compartments of the Target Vehicle and all containers within the Target Vehicle.



ATTACHMENT A-7

**ATTACHMENT A-8**

**Property to Be Searched**


**Green Kia sedan, with Nevada license plate VNK070 ("Target Vehicle 5")** – Registered to a third party in Nevada, but investigators believe **Rogers** and **Ramirez** are presently using it.  The above listed registration information was current as of June 9, 2022.


The places to be searched include all internal and external compartments of the Target Vehicle and all containers within the Target Vehicle.

ATTACHMENT A-8

## ATTACHMENT A-9

**Property to Be Searched**

**A red Ford F150 pickup truck, with California license plate 7Y84695 ("Target Vehicle 6"). Target Vehicle-6** is red crew cab F150 pickup truck registered to Marciel Gomez at a post office box in South Lake Tahoe, CA (as of June 9, 2022). See photograph, below.

The places to be searched include all internal and external compartments of the Target Vehicle and all containers within the Target Vehicle.



.

ATTACHMENT A-9

## ATTACHMENT A-10

## Property to Be Searched

**A black 2013 Cadillac sedan, with California license plate 8XFY975 ("Target Vehicle 7"). Target Vehicle 7** is black with tinted windows. Registered to **William Owen** at 2100 Ethan Way, Sacramento, CA (as of June 9, 2022). See photographs, below.

The places to be searched include all internal and external compartments of the Target Vehicle and all containers within the Target Vehicle.




.

Page 1 of 1

ATTACHMENT A-10

## ATTACHMENT A-11

**Property to Be Searched**

      **A white 2014 Corvette, with California license plate 8UHY531 ("Target Vehicle 8").** **Target Vehicle-8** is white Chevrolet Corvette operated by **William Owen** and registered to him at 2100 Ethan Way, Sacramento, CA (as of June 8, 2022).  See photograph, below.

      The places to be searched include all internal and external compartments of the Target Vehicle and all containers within the Target Vehicle.



.

ATTACHMENT A-11

## <u>ATTACHMENT B</u>

### Particular Things to be Seized

The following items to be seized in whatever form found at the Property To Be Searched described in Attachments A-1 to A-11, for evidence, fruits, or instrumentalities of violations of the Target Offenses:

1. Controlled substances, including methamphetamine and heroin, items frequently used to distribute methamphetamine and heroin, and items containing residue from the distribution of methamphetamine and heroin; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves.

2. United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase methamphetamine and heroin during this investigation.

3. Firearms and ammunition, including but not limited to, handguns, pistols, revolvers, and other weapons, as well as any records or receipts pertaining to firearms and ammunition.

4. Cellular telephones and other communication devices which could be used to participate in distribution of controlled substances or illicit firearms, in violation of 21 U.S.C. § 841(a)(1) or 18 U.S.C. § 922(a)(1)(A);

5. Documents and items evidencing the possession, importation, exportation, and/or distribution of controlled substances or illicit firearms, and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, envelopes, and packaging materials.

6. Books, receipts, notes, ledgers and other forms of records – whether in paper, electronic or other format – evidencing drug distribution activities, or illicit sales of firearms, including "pay/owe sheets."

7. Cash, financial instruments, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances or illicit firearms; as well as records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances.

8. Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, wire transfer receipts, safe deposit box keys, money counting machines, money wrappers, evidence of the use of digital currency, and other items evidencing the obtaining, secreting, transferring, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money, for the time period from January 1, 2021, to execution of the search.

9. Lists of names, aliases, telephone numbers, physical addresses, and email addresses of possible co-conspirators, possible sources of supply, possible customers, financial institutions, and other individuals or businesses with whom a financial relationship

ATTACHMENT B

exits, whether encoded or not, whether stored electronically (e.g., within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Android devices) or on paper (such as in notebooks, address books, pads or other materials).

10. Records or documents that appear to contain access codes for any electronic devices.

11. Telephone bills and toll records, for the time period from January 1, 2021, to execution of the search.

12. Documents evidencing travel by air, bus, car, rental car or other means, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, for the time period from January 1, 2021, to execution of the search.

13. Two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement.

14. Photographs and/or videos of possible associates, possible co-conspirators, real and personal property, weapons, drugs and other evidence of drug trafficking, firearms trafficking, or the proceeds of drug or firearms trafficking.

15. Items of personal property that tend to identify the person(s) in residence occupancy, control, or ownership of the place being searched, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys.

16. Keys belonging to and/or evidence of the existence and usage of any lockers, safe deposit boxes, storage facility, vehicle, or other property.

ATTACHMENT B

_**United States v. Robert Choate, et al.**_, **Case No. 2:22-MJ-0095-KJN**
**Penalties for Criminal Complaint**

**Defendant: Robert CHOATE**

- **Two Counts - 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine**

| 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or<br>Fine of up to $1,000,000; or both fine and imprisonment<br>Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

- **One Count - 21 U.S.C. § 841(a)(1) – Distribution of heroin**

| 21 U.S.C. § 841(a)(1) – Distribution of heroin | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or<br>Fine of up to $1,000,000; or both fine and imprisonment<br>Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

**Defendant: Sarah ANDERSON**

- **One Count - 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine.**

| 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine. | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or<br>Fine of up to $1,000,000; or both fine and imprisonment<br>Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

_[ANDERSON penalties continue on following page.]_

- **Five Counts - 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine**

| 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or<br>Fine of up to $1,000,000; or both fine and imprisonment<br>Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

**Defendant: Fabian GOMEZ**

- **One Count - 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine**

| 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or<br>Fine of up to $1,000,000; or both fine and imprisonment<br>Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

- **Five Counts - 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine**

| 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or<br>Fine of up to $1,000,000; or both fine and imprisonment<br>Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

- **One Count - 21 U.S.C. § 841(a)(1) – Distribution of heroin**

| 21 U.S.C. § 841(a)(1) – Distribution of heroin | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or<br>Fine of up to $1,000,000; or both fine and imprisonment<br>Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

**Defendant:** Epifanio RAMIREZ

- **One Count - 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine**

| 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or Fine of up to $1,000,000; or both fine and imprisonment Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

- **Five Counts - 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine**

| 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or Fine of up to $1,000,000; or both fine and imprisonment Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

**Defendant:** Wendy LABUDA

- **One Count - 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine**

| 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or Fine of up to $1,000,000; or both fine and imprisonment Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

[*LABUDA penalties continue on following page.*]

- **Five Counts - 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine**

| 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or<br>Fine of up to $1,000,000; or both fine and imprisonment<br>Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

- **One Count - 21 U.S.C. § 841(a)(1) – Distribution of heroin**

| 21 U.S.C. § 841(a)(1) – Distribution of heroin | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or<br>Fine of up to $1,000,000; or both fine and imprisonment<br>Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

**Defendant: William OWEN**

- **One Count - 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine**

| 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or<br>Fine of up to $1,000,000; or both fine and imprisonment<br>Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

- **Three Counts - 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine**

| 21 U.S.C. § 841(a)(1) – Distribution of methamphetamine | |
|---|---|
| Maximum Penalties: | Up to 20 years in prison; or<br>Fine of up to $1,000,000; or both fine and imprisonment<br>Supervised release of at least 3 years, up to life. |
| Special Assessment: | $100 (mandatory on each count) |

**Defendant: Joaleen ROGERS**

- **One Count - 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine**

| 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to distribute methamphetamine |
| --- |
| Maximum Penalties: Up to 20 years in prison; or Fine of up to $1,000,000; or both fine and imprisonment Supervised release of at least 3 years, up to life. |
| Special Assessment: $100 (mandatory on each count) |

- **One Count - 21 U.S.C. § 856 – Maintaining a drug-involved premises**

| 21 U.S.C. § 856 – Maintaining a drug-involved premises |
| --- |
| Maximum Penalties: Up to 20 years in prison; or Fine of up to $500,000; or both fine and imprisonment Supervised release term of up to 3 years. |
| Special Assessment: $100 (mandatory on each count) |